1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | **No. CR 09-284-TUC-RCC (CRP)** |
| | ) | |
| **vs.** | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **CARLOS MANUEL DIAZ, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

Defendant Carlos Diaz filed a Motion to Dismiss the Weight Allegation in Count One of the Indictment.  (Doc. 160).  Defendant filed a supplement to the Motion that is improperly named in the docket as an Amended Motion to Dismiss Counts.  (Doc. 185). Defendants Juan Meraz, Adalberto Sonoqui, and Manuel Urrea joined in the Motion. (Docs. 171, 173, 180).   The Government filed its response and, following oral argument, a supplement to its response.  (Docs. 165, 189).  Magistrate Judge Pyle heard oral argument on the Motion on November 18, 2010.  (Doc. 188).

At issue in Defendants' Motion is whether law enforcement officers entrapped Defendants on the amount of marijuana Defendants agreed to steal from a stash house. Defendants argue the weight of the marijuana was controlled by law enforcement and specifically set above the thousand kilogram threshold that requires a mandatory minimum of ten years in prison. *See* 21 U.S.C. § 841(b)(1)(A)(vii).

No evidentiary hearing has been held on the issue before this Court.  The Magistrate Judge provides an overview of the case, deriving the described facts from a number of documents in the docket including: the transcript of the Detention Hearing held before Magistrate Judge Marshall on February 2, 2009; the partial transcripts of the two meetings

between undercover agents and Defendants Diaz and Urrea, in December 2008 and January 2009, when the weight of the marijuana was set; and Defendants Diaz and Urrea's pretrial services reports.  (Docs. 26, 189, Exhibit A from the November 18, 2010 oral argument (*See* Doc. 188), 15, 17).

Defendants are charged with multiple drug trafficking counts arising from a reverse sting.  Tucson Police Department ("TPD") officers and agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), acting on a tip from a confidential informant, created a scenario in which Defendants agreed to steal narcotics from a stash house.  Based on information from the confidential informant, Defendant Diaz was the target of the reverse sting.

Defendants Diaz and Urrea were the two defendants who met with two undercover agents and agreed to the 2500 pound weight of the marijuana that they would steal.  At the time of his presentence report, Defendant Diaz was an eighteen year-old with no significant criminal history.  In 2005, he was reported for domestic violence but no complaint was filed and in 2008, at the age of seventeen, he was charged with possession of a dangerous drug but no disposition was recorded.  Defendant Diaz did admit to using marijuana on a daily basis and to trying cocaine and ecstasy.  Defendant Urrea, a 37 year-old, also had very little criminal history.  He was reported for domestic violence in 2002 but the case was dismissed. The other two entries in his criminal history are for traffic violations.

In a meeting set up by ATF agents, Defendants Diaz and Urrea met with two agents in December 2008.  The weight of the marijuana that Defendants agreed to steal was discussed at this meeting and later confirmed in the January 2009 meeting.  ATF Special Agent Brian Kolar testified at the Detention Hearing that Defendants Diaz and Urrea confirmed their ability and desire to carry out a home invasion.  Agent Kolar also testified that Defendant Diaz told the agents that he had the ability to move several thousand pounds of marijuana.  Agent Kolar testified that Defendants Diaz and Urrea stated they had carried out previous home invasions and told the undercover agents that they had the equipment necessary to do the invasion including police vests.

Reading the transcripts of the meetings, the agents set out most of the details for the proposed invasion and theft. In the December 2008 meeting, Defendant Diaz asks twice "how much weight is it?" before agents tell him. After the second time Defendant Diaz asks about the weight, the agent tells him:

> [a]nywhere between, like, two and three thousand. And, there's always fucking bricks of coke in the house. Always. So, we usually come in, we pick up our shit. He usually has what? Like, two or three different people who come in to pick shit up every time?

(*See* Exhibit A at 19). Defendant Diaz offers no response to the weight and the two agents continue talking about how the stash house operates. Defendant Urrea then comments about the timing for the invasion and says something about Christmas. One of the agents answers:

> [d]ude, these motherfuckers are fucked up. Well, that's what I mean. I wish. It ain't gonna be before Christmas. But I can guarantee you between, between, between two and three thousand pounds. And several bricks of fucking ... several fucking bricks of yayo, dude. No fucking question. And like I said, there's gonna be two dudes packing. And, two fucking nerds writing shit down. You know what I mean? They all fucking ... They all fucking think they're big, act like they're bad motherfuckers and shit.

(*See* Exhibit A at 19 and Doc. 189-1 at 20). Again, Defendants do not respond to the amount of weight and the agents continue talking about the stash house operation. One of the agents then asks Defendant Diaz if he can handle the invasion. Defendant Diaz asks if the agent means the amount of marijuana and the agent tells him yes, the amount of marijuana and the four people at the stash house. Defendant tells the agent that he is "for real", "strapped" and will put the four people "in the closet." ((Doc. 189-1 at 21). He still does not address the amount of marijuana to be moved. Defendant Diaz then says he will bring eight people with him "if there's that much weight." (Doc. 189-1 at 21).

In a later meeting on January 13, 2009, between Defendants Diaz and Urrea and the two undercover agents, the weight of the marijuana is further discussed. Defendant Diaz asks how much is supposed to be picked up and the agents tell him "25" but that a lot more will be available. (Doc. 189-1 at 10). The agents then ask how much Defendants can handle and the agents tell Defendants that they intend to "get them all" and ask Defendants if they will be able to handle it. (Doc. 189-1 at 10). Defendant Diaz tells the agents they can handle "[a] lot of shit" and Defendant Urrea follows it up by telling the agents they can handle

"[e]verything." (Doc. 189-1 at 10). Later in the conversation, Defendant Urrea asks the agents again about the weight; he says "[h]ow much you think more than a 1000?" to which the agents tell him "yeah" and "[w]ell, we're like ... we're looking at 2500." (Doc. 189-1 at 14). Defendant Diaz responds "[o]h yeah, 2500?" (Doc. 189-1 at 14). Defendant Urrea then begins to ask about the logistics of the stash house. In discussing the logistics, the agents tell Defendants that a U-haul truck will be ready for them at the stash house. (Doc. 189-1 at 14). Again discussing the weight later in the conversation, Defendant Diaz says "[y]eah. See how much I take. Take all as much as possible. I want them birds too, shit." (Doc. 189-1 at 17).

As the conversation progresses, the agents initiate a discussion about how they will divide the stolen narcotics. The agents express some concern about the significant amount of marijuana and whether they will be able to move it. Defendant Diaz tells the agents "I got people that buy that shit. I can't shop for you, understand. But not as much ... [Unintelligible - Voices Overlap]." (Doc. 189-1 at 18). The agents then suggest that Defendant Diaz could move their portion also. Defendant Urrea asks them "You guys don't have ... [Unintelligible - Voices Overlap]." (Doc. 189-1 at 18). To which one of the agents responds "[w]ell we do, but see we do but shit they'll know that fucking ... all of a sudden that fucking Arizona shit disappeared." (Doc. 189-1 at 18). Defendant Diaz then says "[i]f I get, if I get those boys, I'll do your shit up and I sell my shit and help you guys with your shit." (Doc. 189-1 at 18). One of the agents then asks Defendant Diaz "[y]ou have a, I mean you have a way you can move that much?" The following is the remaining conversation on weight:

| | |
|---|---|
| Diaz: | [t]hat's where the thing ... I have some dude that I can push like 2 to 3000, but I don't know about that much ... [Unintelligible]. But I know they're legit and I got some others but they buy 50 packs and like 20 packs and shit like that. |
| Agent A: | I mean but let's just, let's get down the nitty-gritty. |
| Diaz: | I got one fool, I got one fool that will like cash me out with like 2000. You know what I'm saying. |
| Agent A: | Right. |
| Diaz: | But ... |
| Agent A: | At one *time*. |
| Diaz: | Yeah, but I got to let him know what's up, dude. Understand? |
| Agent J: | Yeah. |
| Diaz: | I got to be careful too because I don't fuck with ... me, I don't fuck with that much weight. |

(Doc. 189-1 at 19).

In the Motion to Dismiss the Weight Allegation in Count One of the Indictment, Defendants argue the 2500 pound weight set by law enforcement was *sentencing manipulation*, a form of sentencing entrapment.  Sentencing entrapment occurs when "a defendant although predisposed to commit a minor or lesser offense, is entrapped into committing a greater offense subject to greater punishment." *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir.1994).  To prove sentencing entrapment, a defendant must show "the government engaged in outrageous official conduct which caused the individual to commit a more significant crime for which a greater penalty attaches." *United States v. Si*, 343 F.3d 1116, 1128 (9th Cir.2003).  The principle in sentencing entrapment "is that it is impermissible for the government to 'structure sting operations in such a way as to maximize the sentences imposed on defendants' without regard for the defendant's culpability or ability to commit the crime on his own." *United States v. Schafer*, __ F.3d __, 2010 WL 4400052, *7 (9th Cir.2010), *quoting Staufer*, 38 F.3d at 1007.

Common examples of sentencing entrapment include scenarios in which a government agent convinces a drug dealer to purchase or sell more drugs than he is otherwise inclined, often by artificially lowering the price of the drugs or removing other obstacles.  *See Staufer*, 38 F.3d at 1105, 1008 (Defendant wanted to sell only 5,000 doses of LSD but government agent insisted defendant provide 10,000 doses.  Defendant was eventually sentenced on the 10,000 doses and Ninth Circuit held he was entitled to lesser sentence because it was the government's involvement that led to the higher number of doses and therefore, greater crime); *see also United States v. Ramirez-Rangel*, 103 F.3d 1501, 1506 (9th Cir.1997), *abrogated on other grounds*, *Watson v. United States*, 552 U.S. 74 (2007); *see also United States v. Briggs*, 623 F.3d 724, 730 (9th Cir.2010) (providing string cite of example cases).

Less common examples of sentencing entrapment, sometimes referred to as *sentencing manipulation*, include a scenario in which the government agent sets the amount of drugs to be obtained by defendant at a level high enough to impact the defendant's sentence.  Courts have expressed significant concern about potential sentencing manipulation

in cases involving fictional stash houses where the government controls the amount of drugs to be stolen.

Just a few months ago, the Ninth Circuit discussed such a scenario in the *Briggs* case. In *Briggs*, the defendant became the target of an ATF investigation for trafficking in drugs and weapons.   623 F.3d at 726.   An ATF agent made a number of methamphetamine purchases from the defendant but even though the defendant expressed willingness to sell guns, no weapons sales materialized.  *Id*.  As the investigation progressed, ATF began to suspect the defendant was involved in home invasion robberies and commenced a reverse sting against him.  *Id*.  An ATF agent told the defendant that the stash house would contain at least twenty kilograms of cocaine and ten pounds of methamphetamine.  *Id*.  The defendant told the agent that he wanted to be included in the job and that he had a team of people with access to guns.  *Id*.  On the day planned for the invasion, the defendant eventually showed up at the meeting spot with two other people but post-arrest it was discovered that none of them had any weapons.  *Id*. at 727.

The defendant in *Briggs* was charged with multiple counts and eventually pled guilty to the charges.  *Id*.  Post-plea, the defendant obtained new counsel and filed a motion to withdraw his plea.  *Id*.  After his motion was denied and he was sentenced to 324 months, the defendant appealed bringing multiple claims including a claim of sentencing manipulation.  *Id*.  The Ninth Circuit denied his sentencing manipulation claim because he had pled guilty.  *Id*. at 730.  But before denying the plea, the Court did express significant concern about the government's reverse sting operations involving fictional stash houses. The Court stated:

> In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. *See, e.g., United States v. Williams,* 547 F.3d 1187, 1193 (9th Cir.2008) ("[The ATF Agent] said that in a few days, the stash house would contain one hundred kilograms of cocaine and between fifty and sixty thousand dollars in currency, guarded only by the two women who count the money and a single guard with a sawed off shotgun."). The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to

take a hard look to ensure that the proposed stash-house robbery was within the scope of Briggs' ambition and means.

*Id*. at 729 -730.

Courts have grappled with sentencing manipulation as a distinct form of sentencing entrapment and distinct from the trial defense of entrapment.  The Fourth Circuit provides a thoughtful analysis of sentencing entrapment and sentencing manipulation, distinguishing the two as distinct concepts.  *United States v. Jones*, 18 F.3d 1145 (4th Cir.1994).  In *Jones* the defendants were charged with multiple illegal transactions based on a number of transactions coordinated and monitored by law enforcement.  *Id*. at 1151.  These transactions occurred over a number of months.  *Id*. The defendants appealed their sentences arguing their due process rights were violated by law enforcement making multiple purchases to manipulate the base offense level.  *Id*. at 1151-1152.

In distinguishing sentencing *manipulation* from sentencing *entrapment*, the Fourth Circuit noted the critical question in sentencing manipulation is whether the government's conduct of the investigation was so outrageous as to violate due process.  *Id*. at 1153 (internal citation omitted).  As opposed to sentencing entrapment, which focuses on whether the government's outrageous conduct caused a defendant to commit a greater crime than the crime to which he was predisposed.  *Id*.  Supporting its distinction, the Fourth Circuit cited an Eighth Circuit case in which the defendant argued the sting operation in his case was too long and involved too many buys.  *United States v. Shephard*, 4 F.3d 647, 649 (8th Cir.1993).  The Eighth Circuit noted that the defendant's argument "is not properly an entrapment argument, for it focuses not on whether [the defendant] was predisposed to commit the crime, but on whether the government stretched out the investigation merely to increase the sentence [the defendant] would receive."  *Jones*, 18 F.3d at 1153, *quoting Shepard*, 4 F.3d at 649.  The Eighth Circuit then adopted the term "sentence manipulation for the theory that outrageous government conduct that offends due process could justify a reduced sentence."  *Jones*, 18 F.3d at

1153, *quoting Shepard*, 4 f.3d at 649.

While the concept of sentencing manipulation has been pondered by multiple appellate courts, it remains a broad concept without much detailed application.  In *Jones*, issued in 1994, the Fourth Circuit noted that while both the First and Eighth Circuits identified sentencing manipulation as a distinct concept from sentencing entrapment, neither circuit had yet applied the concept in a case.  *Jones*, 18 F.3d at 1154.  Likewise, the Fourth Circuit identified the concept of sentencing manipulation in *Jones* but then also found it inapplicable to the case before the court.  *Id.*  The Fourth Circuit found, instead, that the government's conduct in continuing the investigation and engaging in numerous transactions with the defendants was not outrageous government conduct.  *Id.* at 1155.

In the case before this Court, Defendants ask the Court to recognize sentencing manipulation as a distinct concept, one that analyzes outrageous government misconduct as a violation of due process separate from consideration of a defendant's predisposition.  Brought as a due process claim, outrageous government misconduct must be asserted by a defendant prior to trial.  *United States v. Mausali*, 590 F.3d 1077, 1080 (9th Cir.2010).  Defendants are correct to raise the issue prior to trial.

Based on the information available in the docket, it appears there are facts that would cause the Court concern about the government's use of 2500 pounds of marijuana.  Prior to this case, Defendants Diaz and Urrea had little significant criminal history.  Both Defendants had one domestic violence allegation that did not result in a charge and Defendant Diaz was charged with possessing ecstasy.  Other than that, they have a clean criminal history.  At least from a criminal history perspective, they have engaged in little drug trafficking or have managed to engage in trafficking without getting caught.  Given the transcripts, the Court is inclined to believe it is more likely they had little experience in moving large quantities of narcotics.  During the meetings with the two undercover agents, Defendants Diaz and Urrea do not identify the amount of marijuana they are

capable of moving.  Instead, Defendant Diaz asks multiple times about the amount of marijuana that will be in the house and, in the first meeting, has no comment when the agents tell him twice that the amount will be 2500 pounds.  In the second meeting, Defendant Diaz states he can move "a lot of shit" and Defendant Urrea says they can move "everything."  But when Defendant Urrea asks the agents again about the weight and agents tell him 2500 pounds, Defendant Diaz seems to express surprise or hesitation when he responds "[o]h yeah, 2500?"

The Magistrate Judge is concerned about the amount of marijuana for a number of reasons.  The fact that the agents selected the amount of weight is a significant consideration.  Further significant is the lack of detail Defendants offer in the two meetings with the agents.  From reading parts of the transcripts from both meetings, it is evident to the Court that the agents do a significant amount of the talking and planning.  Defendant Diaz is silent about the amount of marijuana when it comes up in the first meeting and seems, at one point, surprised or hesitant about the amount of marijuana discussed during in the second meeting.  When the agents ask Defendant Diaz if he can move their marijuana as well, Defendant Diaz again seems hesitant.  He appears to say that if he gets help from "boys" he has in mind that he can move the agents' marijuana.  He also tells the agents that he has one guy who can take 2000 to 3000 pounds of marijuana but then he follows that statement by saying he does not "know about that much ..."  Aside from the one person Defendant Diaz identifies as being able to take 2000 to 3000 pounds, Defendant Diaz's other contacts can take significantly less, 50 packs or 20 packs.  Further significant to the Court, the government supplies the U-Haul van to move the marijuana. Nothing from the record offered thus far suggests that Defendants had a vehicle large enough to carry 2500 pounds of marijuana or that they even considered that potential problem.  All of this evidence causes this Court to question whether Defendants were capable of moving 2500 pounds of marijuana.

The premise to the government's case is that the agents successfully set up a reverse sting to catch a gang that had been conducting a series of drug rip-offs in Tucson.

The beginning of the government's response to the motion states as follows:

> Tucson Police Department (TPD) officers received information from a confidential informant regarding individuals conducting home invasions of stash houses containing narcotics. Pursuant to this information, TPD officers acting in an undercover capacity set up a meeting with these individuals. On December 8, 2008, the defendant met with undercover TPD officers for the purpose of discussing a potential home invasion of a stash house containing narcotics. The defendant told the officers he had a crew of individuals and vehicles available to commit such home invasions. The defendant further stated that he has conducted such home invasions in the past, and provided details, stating that he would provide a large crew of approximately eight individuals so as to overwhelm the victims, that two of the individuals would dress as police to gain entry into the house, and that they used firearms and bullet proof vests.

(Doc. 165, pp. 1-2).

This representation of Defendants is not consistent with even the few facts that have been developed to date.  It is not clear that Defendant Diaz had an existing crew.  At least two of the eight defendants were recruited by Defendant Urrea.  (Doc. 26, p 39).  There is no evidence Defendants had the vehicles to pull off such a large heist.  In fact, it is undisputed that the government agents supplied the cargo van.  Defendants did not have the police patches until the January 3rd meeting, meaning, at a minimum,  it is likely Defendants had not used this modus operandi in prior alleged invasions.  No bullet proof vests were used.  (Doc. 26, p. 41).  No assault weapons were used.  Four loaded semi-automatic handguns were recovered, with eight to ten rounds in each weapon.  Not all the weapons were fully loaded, despite the fact that Defendants knew there would be at least two armed men guarding the marijuana.  (Doc. 26, p. 4 ).  The alleged ring-leader, Defendant Diaz, was unarmed when arrested at the staging site.  (Doc. 26, p. 51).  Even more remarkably, Defendant Diaz was dropped off at the staging site by his sister and brother-in-law, who had a small child in the car.  (Doc. 26, p.28).  Finally, while this alleged experienced crew was waiting to follow the undercover agents to the staging site, they took a couple of minutes to drive to a convenience store and buy a six-pack of beer.  (Doc. 26, p. 24).

In addition to the Government's position in its response to this Motion, during the

1 detention hearing, Case Agent Brian Kolar also testified that law enforcement agents

2 were targeting a crew that had accomplished previous drug rip-offs.  In response to the

3 question of what information he had that Defendant Diaz had conducted marijuana

4 robberies in the past, Agent Kolar testified:

> The information that we had was that he used police insignias, possibly DEA insignias, and there were several home invasions that used that same modus operandi to do home invasions. So by his name, not specifically, but there were several home invasions unsolved that used the same techniques that he had -- that were described to us.

9 (Doc. 26, pp. 47-48).

10        But it is clear no attempts were ever made to resolve these unsolved home

11 invasions.  The undercover agents never ask for specifics of how Defendants Diaz and

12 Urrea accomplished these robberies in the past.  No simple questions like what vehicles

13 did you use, what weapons, how much did you get, how did you move it.  Questions like

14 that early on could have determined whether the agents were dealing with posers or

15 whether they actually had suspects capable of stealing 2500 pounds of marijuana.  Just as

16 telling, after arrest, both Defendants Diaz and Urrea made statements, but neither was

17 asked any questions about prior drug rip-offs. (Doc. 198, pp. 22-27).[1]  This is a disservice

18 to interests of community safety, and particularly the interests of the victims traumatized

19 in these prior violent robberies.  It is difficult to explain the agents' lack of interest in

20 asking these questions, unless they had already determined the suspects they were dealing

21 with could not have performed prior drug rip-offs.

22        Adding to the Court's concern is the *in camera* interview with the confidential

23 informant.  The Court is confident that the informant did not suggest the weight of the

24 heist.  But the interview was unusually difficult in terms of the inability of the informant to

---

26        [1] When asked by the Magistrate Judge at oral argument on Defendants' Motion about whether Defendants Diaz and Urrea were ever questioned about prior unsolved home invasions, the prosecutor stated to her knowledge they had not been asked.  She asked for additional time to supplement the record on that point if there was evidence that Defendants were questioned, which the Court granted. (*See* Doc. 198, p. 25).  No supplement was filed.

respond coherently to straightforward questions.  That the Government would have such confidence in such an apparently unclear if not unreliable source, to identify people actively involved in drug rip-offs, particularly without corroboration to a particular incident, is troubling.

The concerns with reverse stings stated in *Briggs* are shared by this Court in this case.  If the Government wants to focus its investigative efforts on seeing if it can entice low income males with little criminal history into participating in lucrative criminal activity, instead of actually trying to resolve prior rip-offs, that is an executive decision.  There can be little sympathy for Defendants such as these who, no matter what their personal circumstances, would allow themselves to become involved in such obviously violent behavior.  But the Court should treat these Defendants for who they really are, not for who the Government wishes they were.

The guidance from the appellate courts on this issue is unclear.  The pressures of separation of powers interests makes the just solution difficult to fashion.  Congress has the authority to set mandatory minimums.  The executive branch has the authority to direct its investigations as it deems appropriate.  But the defendants are entitled to a full and fair resolution of this case.

In this Court's view, the relief requested by Defendants, dismissal of the weight allegation, is too much.  Rather, this Court recommends that these issues be resolved in the sentencing context when and if appropriate.  Under *Apprendi*, this could include a jury determination of the weight of the drug.  The Court recognizes that given the mandatory minimums at issue, the ability to argue for downward departures may be of little solace, particularly to defendants such as these with minimal prior criminal histories.  But until the appellate courts provide more direction, this Court believes that is the best avenue that can be offered to the parties for a just resolution of this very serious case.

This Court recommends that the Motion to Dismiss the Weight Allegation be denied, without prejudice to revisit the issues in the sentencing context.  These are issues

that should be resolved in the sentencing context.  The request for a factual determination that the Government engaged in outrageous conduct is denied as premature for two reasons.  First, the case is not in the sentencing context yet.  Second, there has not been a full evidentiary presentation on these issues.

**RECOMMENDATION**

It is the Report and Recommendation of this Court that the District Judge, after his independent review, DENY Defendants' Motion without prejudice.  (Doc. 160).  The Magistrate Judge notes Defendants' supplement to the Motion is improperly characterized in the docket as a pending motion.  (*See* Doc. 185).  The Magistrate Judge recommends the District Judge order the Clerk's Office to terminate the deadlines attached to Docket 185 and properly name it as a supplement to the Motion to Dismiss the Weight Allegation.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2) and given the trial date of Tuesday, December 14, 2010, the Magistrate Judge requires the parties to file any written objections on or before **Friday, December 10, 2010**.  If objections are not timely filed, they may be deemed waived.  The parties are advised that any objections filed are to be identified with the following case number: **cr-09-284-RCC**.

DATED this 2nd day of December, 2010.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**